# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ALASKA

CODY FLAHERTY, *et al.*,

        Plaintiffs,

    v.

KANAWAY SEAFOODS, INC.,

        Defendant.

Case No. 3:22-cv-00155-SLG

## ORDER RE ALL PENDING MOTIONS

Before the Court is Defendant Kanaway Seafoods, Inc. d/b/a Alaska General Seafoods' (hereinafter "AGS") Motion for Summary Judgment on Plaintiffs' "Closed Campus" Claims at Docket 48. Plaintiffs Cody Flaherty, Jerry Ross, Kegan Flaherty, John Bauman, Elizabeth Patton, and Bryan Barlahan filed a response in opposition at Docket 67, and AGS filed a reply at Docket 70. Plaintiffs filed a supplemental brief at Docket 74 and AGS filed a response at Docket 75. Additionally before the Court at Docket 52 is AGS's Motion to Certify a Question to the Alaska Supreme Court and to Stay Proceedings. Plaintiffs filed a response in opposition at Docket 65, to which AGS replied at Docket 66. Also before the Court at Docket 54 is Plaintiffs' Motion for Certification of a Rule 23 Class Action. AGS responded in opposition at Docket 62, to which Plaintiffs replied at Docket 69. And at Docket 56, Plaintiffs filed a Motion for Conditional Certification of a

FLSA Collective Action. AGS responded in opposition at Docket 59, and Plaintiffs replied at Docket 68. The Court held oral argument on August 22, 2023.

## BACKGROUND

This lawsuit arises from certain policies that AGS put into place in April 2020 to address the COVID-19 pandemic. AGS is a seafood processing company that purchases fresh salmon from independent fisherman and processes it to produce canned, fresh, and frozen salmon. AGS operates two seasonal fish processing plants in Naknek and Ketchikan, Alaska.[1] AGS also operates a seasonal fish camp in Egegik, Alaska.[2]

AGS hires hourly employees to operate its processing facilities.[3] As relevant to this lawsuit, AGS employees work as either machinists, seafood processors, or members of the beach gang.[4] Members of the beach gang are responsible for dock repair and putting boats in the water.[5] The employees who work at AGS in Naknek have been unionized for decades.[6] During the relevant timeframe, there was a machinist union, a processor union, and a beach gang union; each union

---

[1] Docket 49 at ¶ 4.

[2] Docket 49 at ¶ 5.

[3] *See, e.g.*, Docket 55-14 at 3; Docket 55-15 at 3; Docket 55-16 at 3.

[4] Docket 51-1 at 10; Docket 51-2 at 10; Docket 51-3 at 8; Docket 51-4 at 5; Docket 51-5 at 7; Docket 51-7 at 4.

[5] Docket 51-7 at 4.

[6] Docket 49 at ¶ 22.

negotiated a unique Collective Bargaining Agreement ("CBA").[7]

On March 19, 2020, the U.S. Department of Homeland Security, Cybersecurity & Infrastructure Security Agency identified seafood processing facilities, such as AGS, as a critical infrastructure industry and directed these industries "to ensure continued operations" in a manner that "appropriately balance[d] public safety while ensuring the continued delivery of critical infrastructure services and functions."[8] The next day, the State of Alaska similarly identified seafood processing as a critical infrastructure industry.[9] To address the safety concerns posed by the continued operation of critical infrastructure industries during the COVID-19 pandemic, both the state and federal governments directed these industries to create plans for safe operation.[10]

The mandate for AGS to continue operating was complicated by the fact that two of its facilities were in Bristol Bay. Indigenous people in Bristol Bay lost 30 to 40 percent of their population during the 1919 Spanish flu epidemic.[11] As a result,

---

[7] Docket 51-15; Docket 51-16; Docket 51-17.

[8] Docket 50-3 at 2-3, 7.

[9] Docket 50-4 at 4.

[10] Docket 50-5 at 2 (State of Alaska COVID-19 Health Mandate 010 required critical infrastructure to submit a plan "outlining how [they would] avoid the spread of COVID-19 and not endanger the lives of the communities in which [they] operate" and explained that failure to follow the mandate was "punishable by a fine of up to $25,000, or imprisonment of not more than one year, or both."); Docket 49-1 at 2-3 (Interim Guidance from the CDC, OSHA, and FDA directed "seafood processing worksites [to] develop[] plans to continue operations while COVID-19 outbreaks occur" by "work[ing] directly with appropriate state, local, tribal, and territorial (SLTT) public health officials and occupational safety and health professionals.").

[11] Ash Adams, *COVID-19 threatened Alaska's fishermen. Here's how they persevered.*, National Geographic (Aug. 10, 2021), https://www.nationalgeographic.com/culture/article/covid-

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 3 of 43
Case 3:22-cv-00155-SLG   Document 77   Filed 11/15/23   Page 3 of 43

there were heightened concerns regarding the potential impact of COVID-19 on the local population. On April 6, 2020, the Mayor of the City of Dillingham and the First Chief of the Curyung Tribal Council sent a letter to the Governor of Alaska asking him to consider closing the Bristol Bay commercial salmon fishery because of the significant risks posed by the influx of seasonal workers to the remote area.[12]

To determine how the seafood industry could safely operate in Bristol Bay, AGS joined the Naknek/King Salmon Infectious Disease Taskforce in March 2020 along with medical providers, state and local governments, tribal leaders, and other seafood industry operators in Naknek and King Salmon.[13] The taskforce developed a "guideline list of safety protocols" for the seafood industry, which included the recommendation that these companies operate as a "closed campus," meaning that visitors would be prohibited from the plant and employees would be restricted to company property.[14]

AGS developed a May 2020 Workforce Protection Plan for Naknek and a May 2020 Workforce Protection Plan for Ketchikan.[15] Under the heading "Protecting the Public," the plans stated that employees residing in company housing were required to remain on the property and warned that violations would

_____

19-threatened-alaskas-fishing-industry-but-fishermen-fought-back--and-won.

[12] Docket 51-14 at 2-3.

[13] Docket 49 at ¶ 12.

[14] Docket 49-3 at 2.

[15] Docket 50-7; Docket 50-8.

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 4 of 43

result in further training and disciplinary action.[16]  To enforce this closed campus policy, AGS Naknek erected a fence around the property, and a private security company patrolled to ensure compliance.[17]

AGS implemented a closed campus policy at its Naknek location from April 25, 2020, to June 15, 2022.[18]  Jerry Ross, Cody Flaherty, and Kegan Flaherty (the "Named Plaintiffs"), and Bryan Barlahan, Elizabeth Patton, and John Bauman (the "Opt-In Plaintiffs") were all subject to AGS's closed campus policy at some point during the relevant time period.  Each of the Named and Opt-In Plaintiffs was also a member of a union subject to a CBA during this time.[19]

Mr. Ross worked as a port engineer at the Naknek location in 2021 and 2022 and at the Ketchikan location in 2021.[20]  However, Mr. Ross testified that the closed campus policy did not apply to him when he worked at the Ketchikan location in 2021 because his "position there was a little different" and he could come and go from the facility when he was not working.[21]  Cody Flaherty worked as a machinist for AGS at the Naknek location in 2020, 2021, and 2022.[22]  Kegan Flaherty also

---

[16] Docket 50-7 at 4; Docket 50-8 at 4.

[17] Docket 49 at ¶¶ 15, 17; Docket 55-12 (photos of the fence and signs).

[18] Docket 49 at ¶ 7.

[19] Docket 51-1 at 23-24; Docket 51-2 at 33; Docket 51-3 at 38; Docket 51-18 at 2, 4-5.

[20] Docket 51-1 at 10, 16, 19, 23.

[21] Docket 51-1 at 21-22.

[22] Docket 51-2 at 10, 62.

worked as a machinist for AGS at the Naknek location in 2020, 2021, and 2022.[23] Ms. Patton worked as a processor at the Naknek location in 2020 and as a lead processor from 2020 to 2022.[24] Mr. Barlahan also worked as a processor at the Naknek location in 2020 and 2021 and as a lead processor in 2022.[25] Mr. Bauman worked on the beach gang at the Egegik fish camp in 2020, at both Naknek and Egegik in 2021, and at Naknek in 2022.[26]

Named Plaintiffs filed this lawsuit on July 8, 2022, alleging that AGS violated the Fair Labor Standards Act, 29 U.S.C. §§ 201-219, the Portal-to-Portal Act, 29 U.S.C. §§ 251-262 (collectively, the "FLSA"), and the Alaska Wage and Hour Act, Alaska Statutes ("AS") 23.10.050–23.10.150 ("AWHA") by failing to pay appropriate overtime compensation when the closed campus policy was in place. Plaintiffs brought the lawsuit individually and as a collective action pursuant to 29 U.S.C. § 216(b) and a class action pursuant to the AWHA.[27] After initiating this lawsuit, Plaintiffs filed First and Second Amended Complaints.[28]

In their Second Amended Complaint, Plaintiffs allege that AGS's "'closed campus' policy precluded Plaintiffs from leaving [AGS] premises, having guests,

---

[23] Docket 51-3 at 8-9.

[24] Docket 51-4 at 5.

[25] Docket 51-5 at 7.

[26] Docket 51-7 at 4-5, 21.

[27] Docket 1 at ¶¶ 1-3; *see also* Docket 54; Docket 56.

[28] Docket 33; Docket 42.

spending time with their families, or enjoying the surrounding environments."[29]  As such, "Plaintiffs were effectively confined to their workstation during on-clock worktime and to their dorm room during off-clock hours" and "were on-call during their off-the-clock hours."[30]  Plaintiffs contend that "[d]uring their off-the-clock time, [they] were not able to use time effectively for their own personal purposes" and, "on numerous instances[,] Plaintiffs were called to action at all times of the day and night but were not compensated for performing work off-the-clock."[31]  Further, "Plaintiffs were deprived of a reasonable night's sleep of at least five (5) hours of uninterrupted sleep," and "[t]here was not an implied or express agreement between Plaintiffs and Defendant to exclude sleep time."[32]  Plaintiffs seek compensation for the time they worked at AGS's facilities while subjected to a closed campus, from April 2020 to June 2022.[33]

Pursuant to the Scheduling and Planning Order, discovery has been split

---

[29] Docket 42 at ¶ 19.

[30] Docket 42 at ¶¶ 20, 23.

[31] Docket 42 at ¶ 24.  Plaintiffs were compensated for their regular shifts, which consistently included overtime hours.  *See* Docket 51-21 (C. Flaherty's time sheets indicating regular 11 to 18-hour shifts in 2020 and 2021); Docket 51-22 (K. Flaherty's time sheets indicating regular 11 to 19-hour shifts in 2020 and 2021); Docket 51-7 at 6 (Bauman testifying he "clock[ed] in at 8 a.m. and then [was] off the clock at 9 p.m.").  Plaintiffs were also compensated for overtime when they were called out to work after their shifts ended.  *See* Docket 51-1 at 21-23, 25, 27-28 (Ross); Docket 51-2 at 47, 65 (C. Flaherty); Docket 51-3 at 39 (K. Flaherty); Docket 51-7 at 15-16 (Bauman).  Therefore, the time at issue in this case is the remainder of the 24-hour day when Plaintiffs were off their regularly scheduled shifts and were not responding to a call.  *See* Docket 51-3 at 40.

[32] Docket 42 at ¶¶ 26-27.

[33] Docket 76 at 2 (Oral Arg. Tr.).

into two phases.  Phase I was limited to "(1) the merits of the 'closed campus' claim; (2) whether or to what extent the determination of Plaintiffs' claims will require an interpretation or analysis of certain labor agreements between the Parties; and (3) whether Plaintiffs are similarly situated to the putative collective action members."[34]  Phase I of discovery was completed on February 14, 2023.[35]  Thereafter, AGS timely filed a Motion for Summary Judgment and a Motion to Certify Question to Alaska Supreme Court and to Stay Proceedings.[36]  Plaintiffs also timely filed a Motion to Certify Class of a Rule 23 Class Action and a Motion to Certify Class of a FLSA Collective Action.[37]   All motions are now ripe for consideration.

## JURISDICTION

The Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 because a portion of Plaintiffs' claims are based on the FLSA.  The Court has supplemental jurisdiction over Plaintiffs' AWHA claims pursuant to 28 U.S.C. § 1367.

---

[34] Docket 24 at 2.

[35] Docket 34.

[36] Docket 48; Docket 52.

[37] Docket 54; Docket 56.

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 8 of 43

## DISCUSSION

## I. Motion for Summary Judgment

AGS has moved for summary judgment, alleging that all of Plaintiffs' claims are precluded and preempted by federal law and lack merit.[38]  Federal Rule of Civil Procedure 56(a) directs a court to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  When considering a motion for summary judgment, a court views the facts in the light most favorable to the non-moving party and draws "all justifiable inferences" in the non-moving party's favor.[39]

"The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of fact for trial."[40]  However, "[w]hen the nonmoving party has the burden of proof at trial, the moving party need only point out 'that there is an absence of evidence to support the nonmoving party's case.'"[41]  If the movant meets this burden, the non-moving party must demonstrate "specific facts showing that there is a genuine issue for trial."[42]  The non-moving party may not rely on "mere allegations or denials"; rather, to reach the level of a

---

[38] Docket 48-1.

[39] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

[40] *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir. 2001) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[41] *Id.* (quoting *Celotex Corp.*, 477 U.S. at 325).

[42] *Celotex Corp.*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)).

genuine dispute, the evidence must be such "that a reasonable jury could return a verdict for the nonmoving party."[43]

As a preliminary matter, AGS requests that the Court address summary judgment prior to class certification to avoid certifying a class if Plaintiffs have a meritless claim.[44] In response, Plaintiffs ask the Court to first decide the class certification motions and to stay the summary judgment ruling until Phase II of discovery is complete.[45]

The Ninth Circuit has held that "it is within the discretion of the district court" to decide a motion for summary judgment before ruling on class certification "where considerations of fairness and economy" justify such a procedure "and where the defendant consents to the procedure."[46] AGS's motion for summary judgment that is now before the Court is a dispositive motion concerning Phase I issues that was filed at the close of Phase I of discovery in accordance with the Scheduling and Planning Order that is ripe for determination at this time.[47]

---

[43] *Anderson*, 477 U.S. at 248.

[44] Docket 48-1 at 29-30.

[45] Docket 67 at 16-18.

[46] *Wright v. Schock*, 742 F.2d 541, 545-46 (9th Cir. 1984).

[47] Docket 24 at 2. *See also Corbin v. Time Warner Ent.-Advance/Newhouse P'ship*, 821 F.3d 1069, 1085 (9th Cir. 2016) ("If the . . . claim is without merit as applied to [the plaintiff], it follows that the district court need not inquire as to whether that meritless claim should form the basis of a class action." (citations omitted)).

### a. Preemption and Preclusion

All of the Named and Opt-In Plaintiffs in this case were parties to CBAs that governed the terms and conditions of their employment with AGS during the pandemic, including their wages, overtime, and break time.[48]  AGS maintains that the Court will need to interpret these CBAs to resolve Plaintiffs' claims that they are entitled to compensation under federal and state law for time spent waiting to work or sleeping because the CBAs define what constitutes compensable work. AGS points out that the interpretation of labor agreements, such as CBAs, is reserved exclusively for federal labor arbitrators in accordance with § 301 of the Labor Management Relations Act ("LMRA").[49]  Indeed, the CBAs for the machinists, processors, and members of the beach gang all contained grievance and arbitration procedures.[50]  AGS accordingly contends that Plaintiffs' FLSA and AWHA claims are preempted and precluded by the LMRA and must be dismissed on summary judgment.[51]

AGS relies on *Columbia Export Terminal, LLC v. International Longshore & Warehouse Union*[52] to support its claim that the LMRA precludes and preempts

---

[48] Docket 51-1 at 23-24; Docket 51-2 at 33; Docket 51-3 at 38; Docket 51-18 at 2, 4-5.

[49] Docket 48-1 at 30-31.

[50] Docket 51-15 at 22 (mandatory arbitration procedure for machinists); Docket 51-16 at 14 (processors have a mechanism for arbitration, but may pursue any mutually agreed upon procedure); Docket 51-17 at 16-17 (mandatory arbitration procedure for beach gang).

[51] Docket 48-1 at 30-40.

[52] 23 F.4th 836 (9th Cir. 2022).

Plaintiffs' FLSA and AWHA claims.[53]   In *Columbia Export Terminal*, the Ninth Circuit highlighted two key principles of preemption under the LMRA.  The first is that "[o]n its face, § 301 reads as a jurisdictional statute, and it 'contains no express language of preemption, [but] the Supreme Court has long interpreted the [provision] as authorizing federal courts to create a uniform body of federal common law to adjudicate disputes that arise out of labor contracts.'"[54]  For this reason, the Supreme Court has held that the LMRA impliedly preempts state law.[55]  The second key principle is that "the arbitrator, not the court, [] has the responsibility to interpret [a] labor contract in the first instance."[56]  Accordingly, § 301 preemption "is designed to ensure 'specific performance of promises to arbitrate grievances under collective bargaining agreements.'"[57]  In accordance with these principles, the Ninth Circuit has "applied the preemptive effect of § 301 to all 'state law claims grounded in the provisions of a CBA or requiring interpretation of a CBA.'"[58]

The question at issue in *Columbia Export Terminal* was whether § 301 of

---

[53] Docket 48-1 at 30.

[54] *Columbia Exp. Terminal*, 23 F.4th at 841 (first alteration added, second and third alterations in original) (quoting *Curtis v. Irwin Indus., Inc.*, 913 F.3d 1146, 1151 (9th Cir. 2019)).

[55] *Id.* (citing *Teamsters v. Lucas Flour Co.*, 369 U.S. 95, 104 (1962)).

[56] *Id.* (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985)).

[57] *Id.* at 842 (quoting *Textile Workers Union v. Lincoln Mills*, 353 U.S. 448, 451 (1957)).

[58] *Id.* at 841 (quoting *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1032 (9th Cir. 2016)).

the LMRA also precludes claims arising under federal law.[59]  More specifically, the plaintiff brought a claim pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO") alleging that the defendants "conspired to fraudulently furnish timesheets reporting hours that were not actually worked and, as a result, overbilled [the plaintiff] by more than $5.3 million."[60]  The defendants filed a motion to dismiss, contending that the RICO claims were precluded under § 301 of the LMRA "because resolution of the claims required interpretation of the underlying CBA, which require[d] exhaustion of the agreement's grievance procedures."[61]  The Ninth Circuit held that "a RICO claim is precluded by § 301 of the LMRA when the right or duty upon which the claim is based is created by a CBA or resolution of the claim substantially depends on analysis of a CBA."[62]

AGS contends that *Columbia Export Terminal* stands for the proposition that "federal and state claims are preempted [or precluded] if they seek to vindicate a right 'created by the [CBA] itself' or if the claim 'is substantially dependent on analysis of the CBA.'"[63]  However, the Ninth Circuit in *Columbia Export Terminal*

---

[59] Although sometimes used interchangeably, "preemption doctrine derives from the Supremacy Clause of the Constitution and concerns the primacy of federal laws" over state laws, and preclusion determines whether one federal law precludes action under another federal law.  *See Felt v. Atchison, Topeka & Santa Fe R.R. Co.*, 60 F.3d 1416, 1418-19 (9th Cir. 1995) (alteration omitted).

[60] *Columbia Exp. Terminal*, 23 F.4th at 840.

[61] *Id.*

[62] *Id.* at 844.

[63] Docket 70 at 6-7 (emphases omitted) (quoting *Columbia Exp. Terminal*, 23 F.4th at 842).

recognized a limitation of its holding that is relevant in this case. This limitation comes from the Supreme Court's decision in *Atchison, Topeka & Santa Fe Railway Co. v. Buell*, which "reiterated the general rule in favor of compelling arbitration in labor disputes, while recognizing an exception for claims based on federal statutes that contain specific substantive guarantees for workers."[64] In *Buell*, the Supreme Court held that the Federal Employers Liability Act provided one such substantive guarantee for workers and was not precluded by a statute similar to the LMRA: the Railway Labor Act.[65] Similarly, the Supreme Court has held that submission of a claim to arbitration did not preclude claims brought pursuant to other federal statutes providing specific substantive guarantees to workers, including § 1983 claims, Title VII claims, and, as relevant here, FLSA claims.[66]

The Ninth Circuit in *Columbia Export Terminal* explained that the *Buell* exception did not apply to the facts before it because the claims were brought by an employer, "and the federal statute at issue, RICO, does not establish

---

[64] *Columbia Exp. Terminal*, 23 F.4th at 848 (citing *Atchison, Topeka & Santa Fe R.R. Co. v. Buell*, 480 U.S. 557, 565 (1987)).

[65] *Buell*, 480 U.S. at 565-67 (noting that the "FELA not only provides railroad workers with substantive protection against negligent conduct that is independent of the employer's obligations under its collective-bargaining agreement, but also affords injured workers a remedy suited to their needs," damages).

[66] *Id.* at 564-65 (first citing *McDonald v. City of West Branch*, 466 U.S. 284 (1984) (CBA arbitration decision does not preclude § 1983 claim); then citing *Barrentine v. Ark.-Best Freight Sys., Inc.*, 450 U.S. 728 (1981) (CBA arbitration decision does not preclude FLSA claim); and then citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974) (CBA arbitration decision does not preclude Title VII claims)).

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 14 of 43

substantive guarantees for workers."[67]   By contrast, this case is brought by employees, not an employer.  Moreover, Plaintiffs are invoking federal and state statutes that provide nonnegotiable substantive rights to individual workers: the FLSA and AWHA.  AGS nonetheless urges the Court to follow cases from the Third and Sixth Circuits that were cited favorably in *Columbia Export Terminal* and "held that the LMRA precludes FLSA claims."[68]

The Court declines to follow this out-of-circuit precedent, however, because there is binding Ninth Circuit authority that governs the outcome of this issue.  In *Albertson's, Inc. v. United Food & Commercial Workers Union, AFL-CIO & CLC*, the Ninth Circuit considered whether members of a union had to submit their claims to arbitration before bringing suit under the FLSA to collect wages for time worked when Albertson's allegedly required its employees to perform certain work without punching the time clock.[69]   The Ninth Circuit explained that "the rights of employees arising out of the collective bargaining agreement are separate and distinct from those arising out of a statute such as the FLSA."[70]   Therefore, the Ninth Circuit held "that employees covered by a collective bargaining agreement are entitled to take their FLSA claims to court regardless of whether those claims

---

[67] *Columbia Exp. Terminal*, 23 F.4th at 848.

[68] Docket 70 at 10 (first quoting *Columbia Exp. Terminal*, 23 F.4th at 843 n.3; then citing *Vadino v. A. Valey Eng'rs*, 903 F.2d 253 (3d Cir. 1990); and then citing *Martin v. Lake Cnty. Sewer Co.*, 269 F.3d 673 (6th Cir. 2001)).

[69] 157 F.3d 758, 759-60 (9th Cir. 1998).

[70] *Id.* at 760 (citing *Barrentine*, 450 U.S. at 737).

may also be covered by the grievance-arbitration procedure."[71]  In *Columbia Export Terminal*, the Ninth Circuit did not mention, let alone overrule, the holding in *Albertson's*.[72]  The Court will follow *Albertson's* and concludes that Plaintiffs' FLSA claims are not precluded by the LMRA.

Having decided that Plaintiffs' federal claims are not precluded, the Court now considers whether Plaintiffs' AWHA claim is preempted by the LMRA.[73] Plaintiffs allege they are owed overtime pay pursuant to AS 23.10.060 for "all the time they spent being subjected to the 'closed campus' policy."[74]  AS 23.10.060 provides that an employee is entitled to overtime compensation at a rate of one and one-half times the regular rate of pay for hours worked in excess of eight hours a day and in excess of 40 hours a week.[75]  The Alaska Administrative Code ("AAC") explains further that:

> [w]hen computing an employee's hours for the purpose of determining overtime, the employer shall count all hours the employee worked during that week including periods of "on call" and "standby or waiting

---

[71] *Id.* at 762.

[72] *See* 23 F.4th 836.

[73] There are substantial similarities between the AWHA and the FLSA.  Indeed, the Alaska Supreme Court has "recognized that the AWHA is based on the [FLSA]," although "[t]he two Acts are not identical"; for example, the AWHA "imposes on employers a *higher* standard of overtime pay."  *McKeown v. Kinney Shoe Corp.*, 820 P.2d 1068, 1070 n.2 (Alaska 1991) (emphasis in original) (citations omitted).  Nonetheless, Alaska courts "have found the federal court interpretations of the FLSA helpful in interpreting consistent aspects of the AWHA."  *Id.* (citation omitted).  Considering the similarities between the AWHA and the FLSA, the Court's analysis of whether the LMRA preempts the AWHA is appropriately guided by the foregoing analysis that the LMRA does not preclude FLSA claims.

[74] Docket 42 at ¶¶ 49, 52.

[75] AS 23.10.060(a), (b).

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 16 of 43

time" required for the convenience of the employer which were a necessary part of the employee's performance of the employment.[76]

Plaintiffs contend that, when the "closed campus" policy was in place, all time spent "wherein the employees were required to remain on Defendant's property" and "were effectively restricted to their rooms and not allowed guests" constituted on call or waiting time pursuant to Alaska law, for which they are entitled to overtime compensation because they "could not use their time effectively for their own purposes."[77]

When considering whether the LMRA preempts a state law claim, the Ninth Circuit has articulated the following two-step inquiry: First, a court considers "whether the asserted cause of action involves a right conferred upon an employee by virtue of state law, not by a CBA. If the right exists solely as a result of the CBA, then the claim is preempted . . . ."[78] If the right underlying the state law claim "exists independently of the CBA," then a court "moves to the second step" and asks if the right "is nevertheless 'substantially dependent on analysis of a collective-bargaining agreement.'"[79] To determine whether a state law claim is substantially dependent on the terms of a CBA, a court considers whether the

---

[76] 8 AAC § 15.100(c).

[77] *See* Docket 67 at 48-51 (citing 8 AAC § 15.100(c)); Docket 42 at ¶ 52.

[78] *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1032 (9th Cir. 2016) (quoting *Burnside v. Kiewit Pac. Corp.*, 491 F.3d 1053, 1059 (9th Cir. 2007)).

[79] *Id.* (quoting *Burnside*, 491 F.3d at 1059).

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 17 of 43

claim can be resolved by looking to—as opposed to interpreting—the CBA, although this "'look to'/'interpret' distinction is 'not always clear or amenable to a bright-line test.'"[80] If there is substantial dependence, then the state law claim is preempted.[81]

The Supreme Court has cautioned, however, that "§ 301 cannot be read broadly to pre-empt nonnegotiable rights conferred on individual employees as a matter of state law."[82] For example, in *Livadas v. Bradshaw*, the Supreme Court held that a claim brought pursuant to a California law "requir[ing] employers to pay all wages due immediately upon an employee's discharge" was not preempted by § 301.[83] The Supreme Court explained that the only issue raised was whether the employer "'willfully fail[ed] to pay' [the employee's] wages promptly upon severance," and that this was "a question of state law, entirely independent of any understanding embodied in the collective-bargaining agreement between the union and the employer."[84] In other words, "the primary text" for deciding whether the employee was entitled to compensation "was not the Food Store Contract, but

---

[80] *Burnside*, 491 F.3d at 1060 (quoting *Cramer v. Consol. Freightways Inc.*, 255 F.3d 683, 691 (9th Cir. 2001)).

[81] *Kobold*, 832 F.3d at 1033.

[82] *Livadas v. Bradshaw*, 512 U.S. 107, 123 (1994).

[83] *Id.* at 110, 125.

[84] *Id.* at 124-25 (first alteration in original).

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 18 of 43

a calendar."[85]

AGS concedes that Plaintiffs' state law claims are not preempted at step one of the analysis; instead, AGS contends that Plaintiffs' claims are preempted by § 301 of the LMRA because the resolution of their claims is substantially dependent on the analysis of the CBAs.[86] This is because the CBAs "contain detailed provisions spelling out the precise circumstances concerning when and how overtime . . . was to be paid."[87] For example, the Machinist CBA contains the following relevant provisions:

> Workday: . . . When an employee has terminated a shift, they shall not be required to start work again until a four (4) hour rest period has elapsed, unless they receive overtime pay (separate and apart from season's guarantee). Eight (8) hours within nine (9) consecutive hours between 6:00 A.M. and 6:00 P.M. shall constitute a day's work . . . .[88]
>
> . . . .
>
> Call Time: When employees are required to report for work at overtime outside of their regular shifts, they shall receive a minimum of two (2) hours for each call, unless work continues into the regular working day.[89]

---

[85] *Id.* at 124.

[86] Docket 48-1 at 30 (acknowledging that "these claims do not expressly arise from CBAs"), 37 ("Applying the two-part test here, Plaintiffs' FLSA and AWHA claims are precluded/preempted by Section 301 because resolution of their 'closed campus' claim is substantially dependent on interpretation of their respective CBAs.").

[87] Docket 48-1 at 32.

[88] Docket 51-15 at 8.

[89] Docket 51-15 at 12.

AGS contends that resolving the question of whether Plaintiffs are entitled to compensation for all of the time spent on the closed campus will "necessarily require interpretation of the Plaintiffs' respective CBAs to determine whether, and to what extent, closing the campus to prevent the spread of COVID-19 modified the clearly bargained for overtime, call time, and time worked provisions in the CBAs."[90]

Plaintiffs are not claiming, however, that the CBAs were modified to entitle them to compensation for all time spent on the closed campus. Indeed, the Machinist CBA that was in place while the closed campus policy was in effect suggests that the parties did not intend to compensate Plaintiffs for this time. As AGS points out, the "Workday" and "Call Time" provisions rely on the term "work" to trigger compensation.[91] Instead, Plaintiffs maintain that, irrespective of what the CBAs say, they are entitled to compensation for time spent on the closed campus because AS 23.10.060 accords them a right to overtime compensation and 8 AAC § 15.100(c) extends the right to overtime compensation for time spent waiting to work.[92] In other words, the statutory entitlement to overtime compensation cannot be bargained away in a CBA and, to the extent that the Machinist CBA may have denied Plaintiffs this compensation, the CBA violates AS 23.10.060 and 8 AAC §

---

[90] Docket 48-1 at 37.

[91] Docket 48-1 at 32.

[92] Docket 67 at 27-29, 46.

15.100(c).

In *Norcon, Inc. v. Kotowski*, the Alaska Supreme Court considered a similar issue: whether § 301 of the LMRA preempted claims brought pursuant to AS 23.05.140.[93]  Both AS 23.05.140 and the AWHA are part of Title 23 of the Alaska Statutes, entitled "Labor and Workers' Compensation."  AS 23.05.140 requires an employer to pay "all wages, salaries, or other compensation . . . within three working days" of an employee's termination, regardless of the cause of termination, and imposes a penalty on employers who do not comply.[94]  The Alaska Supreme Court explained that "Alaska Statute 23.05.140 confers on an employee an independent statutory right that requires no CBA interpretation to adjudicate."[95]  The court held that the plaintiff's claims that she was owed "unpaid wages and overtime pay she never received . . . could be adjudicated without reference to the CBA," so these claims were not preempted by the LMRA.[96]  To the extent that the parties disagreed "on the applicable wage rate" or whether the plaintiff was "owed extended post-discharge pay or other special payments under the CBA," however, the Alaska Supreme Court held that "such claims would be pre-empted by the LMRA since their adjudication would require interpretation of

---

[93] 971 P.2d 158 (Alaska 1999).

[94] AS 23.05.140.

[95] *Norcon, Inc.*, 971 P.2d at 168.

[96] *Id.*

the CBA."[97]  In sum, a claim brought pursuant to Title 23 concerning Labor and Workers' Compensation is not preempted by the LMRA if the resolution of the claim does not require interpretation of a CBA.

Much like the statute at issue in *Norcon, Inc.*, the AWHA "confers on an employee an independent statutory right" to overtime pay for time spent on call or waiting to work "that requires no CBA interpretation to adjudicate."[98]  The Court considers the record evidence illustrating how Plaintiffs spent their time on the closed campus outside of regular working hours to determine whether Plaintiffs are owed overtime compensation for all time spent on the closed campus pursuant to the AWHA.  And the Court only consults the relevant portions of the CBAs to determine whether the CBAs included Plaintiffs' waiting time as compensable working time.[99]

In sum, Plaintiffs' FLSA claim is not precluded and Plaintiffs' AWHA claim is not preempted by § 301 of the LMRA.  The Court does not grant summary judgment on this basis.

### b.  Fair Labor Standards Act

If an employee works more than 40 hours during a workweek, the FLSA

---

[97] *Id.*

[98] *See id.*

[99] *See Livadas*, 512 U.S. at 124 ("[W]hen the meaning of contract terms is not the subject of dispute, the bare fact that a collective-bargaining agreement will be consulted in the course of state-law litigation plainly does not require the claim to be extinguished[.]" (citation omitted)).

requires his employer to pay him for the additional hours "at a rate not less than one and one-half times the regular rate at which he is employed."[100]

### i. Waiting Time

Pursuant to 29 C.F.R. § 785.14, "waiting time" may be compensable hours worked. During an employee's waiting time, "facts may show that the employee was 'engaged to wait,' which is compensable, or they may show that the employee 'waited to be engaged,' which is not compensable."[101]

> Whether waiting time is time worked under the [FLSA] . . . involves "scrutiny and construction of the agreements between particular parties, appraisal of their practical construction of the working agreement by conduct, consideration of the nature of the service, and its relation to the waiting time, and all of the circumstances."[102]

In the Ninth Circuit, "the two predominant factors in determining whether an employee's on-call waiting time is compensable overtime are (1) the degree to which the employee is free to engage in personal activities; and (2) the agreements between the parties."[103] To "gaug[e] the extent to which employees could pursue personal activities," courts apply the *Owens* factors, which evaluate

> (1) whether there was an on-premises living requirement; (2) whether there were excessive geographical restrictions on employee's movements; (3) whether the frequency of calls was unduly restrictive; (4) whether a fixed time limit for response was unduly restrictive; (5)

---

[100] 29 U.S.C. § 207(a)(1).

[101] *Owens v. Loc. No. 169, Ass'n of W. Pulp & Paper Workers*, 971 F.2d 347, 350 (9th Cir. 1992) (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 137 (1944)).

[102] 29 C.F.R. § 785.14 (quoting *Skidmore*, 323 U.S. at 137).

[103] *Brigham v. Eugene Water & Elec. Bd.*, 357 F.3d 931, 936 (9th Cir. 2004) (internal quotation marks and citation omitted).

whether the on-call employee could easily trade on-call responsibilities; (6) whether use of a pager could ease restrictions; and (7) whether the employee had actually engaged in personal activities during call-in time.[104]

"Because 'no one factor is dispositive,' a court should balance the factors permitting personal pursuits against the factors restricting personal pursuits to determine whether the employee is so restricted that he is effectively engaged to wait."[105] "Whether and to what extent employees are able to use on-call time for personal activities is a question of fact."[106] "However, whether the limitations on the employees' personal activities while on-call are such that on-call waiting time would be considered compensable overtime under the FLSA is a question of law . . . ."[107]

AGS asserts that Plaintiffs are not entitled to overtime compensation even though they were required to remain on AGS's campus during the pandemic because they were not actually working during the hours in question, and the *Owens* factors indicate that Plaintiffs were waiting to be engaged, not engaged to wait.[108] Plaintiffs counter that the uncompensated remainder of the 24-hour day was compensable overtime because the *Owens* factors show they were engaged

---

[104] *Id.* (quoting *Owens*, 971 F.2d at 351).

[105] *Berry v. County of Sonoma*, 30 F.3d 1174, 1183 (9th Cir. 1994) (alteration omitted) (quoting *Owens*, 971 F.3d at 351).

[106] *Id.* at 1180 (citations omitted).

[107] *Id.* (citations omitted).

[108] Docket 48-1 at 44-49.

Case No. 3:22-cv-00155-SLG, *Flaherty, et al., v. Kanaway Seafoods, Inc.*
Order re All Pending Motions
Page 24 of 43

to wait and there was no agreement to exclude those hours from compensable time.[109]

As to the first *Owens* factor, it is undisputed that there was an on-premises living requirement at the Naknek facility pursuant to the closed campus policy.[110] And, regarding the second factor, there was a geographical restriction on Plaintiffs' movements in that they were unable to leave the 14-acre AGS Naknek campus.[111] However, whether this restriction was "excessive" is less clear. Considering that the closed campus policy was imposed during a global pandemic to comply with federal, state, and local guidance and in an effort to keep employees and the surrounding community safe from COVID-19, it is debatable whether the geographic restriction was excessive. Plaintiffs could roam the 14-acre site, and no AGS policy mandated that they spend their off-shift time confined to their rooms.[112] In 2021, Mr. Ross left campus regularly to drive to another AGS worksite and to pick up food from Naknek restaurants.[113] However, the remaining Plaintiffs

---

[109] Docket 67 at 39-46.

[110] Docket 43 at ¶¶ 19, 21; Docket 51-15 at 14; Docket 51-16 at 9-10.

[111] Docket 49 at ¶¶ 15-16 (noting that "AGS Naknek erected a fence and placed security at its gate to the Naknek property to ensure compliance with the 'closed campus' restrictions" and that the campus "is approximately 14 acres").

[112] Docket 51-2 at 24 (C. Flaherty testifying that he was allowed to walk or ride his ATV around campus); Docket 51-3 at 25 (K. Flaherty testifying that he drove his ATV on campus to and from work and that he could walk around outside); Docket 51-4 at 21 (Patton testifying that she could walk around campus); Docket 51-7 at 7 (Bauman testifying that he could walk around campus but that "it was frowned upon, you know, socializing and coming into contact with other people").

[113] Docket 51-1 at 16-17.

did not leave the campus during their off-shift time.[114]  Drawing the reasonable inference in Plaintiffs' favor that the geographical limitation was excessive, the first two *Owens* factors weigh in favor of a finding that Plaintiffs were not free to engage in personal activities during their waiting time.

However, other *Owens* factors weigh in favor of finding that Plaintiffs were free to engage in personal activities.  Regarding the third factor—whether the frequency of calls to work was unduly restrictive—the record shows that Plaintiffs were called infrequently—less than a handful of times over three seasons.  Mr. Ross was called back three to four times in 2021 and two to three times in 2022, or about once a month over a three-month fishing season.[115]  Cody Flaherty was called back to work "[p]otentially up to five times" in total during the 2020, 2021, and 2022 seasons, or about once every other month.[116]  Kegan Flaherty was not called back at all in 2020, 2021, or 2022.[117]  Mr. Bauman testified that he was called back 40-60 times in 2020 at Egegik and 20-25 times in 2021 at Naknek.[118] However, Mr. Bauman's time sheets showed only four call backs in 2020 and six

---

[114] Docket 51-2 at 22 (C. Flaherty testifying that he was "never allowed to leave"); Docket 51-3 at 27 (K. Flaherty testifying that he did not leave campus at all in 2021 except to perform work on a barge for AGS over three or four days); Docket 51-4 at 10 (Patton testifying that she was not allowed to leave campus to go to the store); Docket 51-7 at 7 (Bauman testifying that he was unable to "go out and visit [his] friends, stretch [his] legs, relax, take in the scenery").

[115] Docket 51-1 at 18, 23.

[116] Docket 51-2 at 39, 62 (recounting two to three callbacks in 2020, one callback in 2021, and two callbacks in 2022).

[117] Docket 51-3 at 23, 29, 34, 53.

[118] Docket 51-7 at 14.

call backs in 2021, or about twice a month.[119]

In *Brigham v. Eugene Water & Electric Board*, the utility company's employees were required to live on the company's remote property and work 24-hour on call shifts.[120] The employees were actually called out on average once or twice a month.[121] The Ninth Circuit determined that the infrequency of the calls indicated that the employees could pursue personal activities during their on call time.[122] Here, Plaintiffs were called back, at most, twice a month. Accordingly, the frequency of calls was not unduly restrictive on Plaintiffs' ability to pursue personal activities during their waiting time.

Further, as to the seventh factor, the record shows that Plaintiffs actually engaged in personal activities during waiting time. Mr. Ross generally worked from 8 a.m. to 9 p.m. during the preseason and longer, less predictable hours during

---

[119] Docket 51-26 at 3, 9-10, 12, 19-20, 23-24, 27. Mr. Bauman testified that he recorded all call back time on his timesheets and that he was paid for that time. Docket 51-7 at 14.

[120] *Brigham*, 357 F.3d at 933-34.

[121] *Id.* at 934 n.6.

[122] *Id.* at 936-37. Ultimately, however, the Ninth Circuit in *Brigham* held that the *Owens* factors "weigh[ed] narrowly in favor of the employees," explaining that the low frequency of calls might not be as significant of a factor in that case because the employees were "responsible for the safety of thousands of people and, accordingly, had to be absolutely prepared to respond at all times (i.e., rested, sober, clothed, and otherwise able to race immediately to the trouble source if needed)." *Id.* at 938. By contrast, Plaintiffs in the instant case were not responsible for the safety of thousands of people, and the record indicates they consumed alcohol during their off-shift time. *See* Docket 51-7 at 8 (Bauman testifying that he drank alcohol daily in 2020 and 2021); Docket 51-2 at 16 (C. Flaherty testifying that before 2020 he would keep beer in his personal refrigerator); Docket 51-3 at 12 (K. Flaherty testifying that he had beer in his personal refrigerator); Docket 51-1 at 13 (Ross testifying that he brought beer to Naknek in 2019 by barge). As such, the infrequency of calls remains informative to the Court's analysis here.

processing season.[123]  As noted, Mr. Ross drove his truck to pick up food from Naknek restaurants and he used an AGS-provided delivery service to get supplies delivered to campus.[124]  He also slept six to seven hours each night during the preseason and five hours during the processing season.[125]

Cody Flaherty worked 11-hour shifts during the preseason and, at minimum, 18-hour shifts during processing season.[126]  During the preseason, he got at least seven hours of sleep a night.[127]  During the processing season, he got four to five hours of sleep and, when off shift, he "would try to sleep that entire time, maybe try to get a shower in."[128]  In 2020, after his shift, Cody Flaherty socialized with his brother.[129]  He did not use the AGS delivery service to get food from local restaurants or the grocery store at all that year, but he was aware that it was an option.[130]  In 2021, he utilized the delivery service at most four times to get food or supplies.[131]  There was a "halfway party" that season but he did not attend.[132]  In

---

[123] Docket 51-1 at 11, 13.

[124] Docket 51-1 at 16-17.

[125] Docket 51-1 at 27-28, 46.

[126] Docket 51-2 at 12, 23, 27.

[127] Docket 51-2 at 16.

[128] Docket 51-2 at 16, 37.

[129] Docket 51-2 at 24.

[130] Docket 51-2 at 24.

[131] Docket 51-2 at 27.

[132] Docket 51-2 at 27.

2022, Cody Flaherty socialized with his brother and another resident of their four-room house, and they played videogames together every week or two.[133]  He had a personal internet connection and he used the delivery service.[134]  Cody Flaherty also attended the midseason party that year.[135]

During the preseason, Kegan Flaherty worked from 8 a.m. to 9 p.m., and, during the processing season, he worked 18-hour shifts.[136]  Generally, after his shift during the preseason, he would shower, call home, talk to his brother, and sleep.[137]  Specifically in 2020, once he was off his shift, Kegan Flaherty called his girlfriend, watched TV, and talked to his brother.[138]  "[E]very now and then," he would play a game with his brother or another friend.[139]  He had pizza delivered a few times.[140]  He would also ride his ATV on campus to and from work.[141]  However, due to the closed campus policy, he could not ride his ATV to the beach or up and down the road.[142]  In 2021, Kegan Flaherty had pizza delivered once,

---

[133] Docket 51-2 at 31.

[134] Docket 51-2 at 31.

[135] Docket 51-2 at 31.

[136] Docket 51-3 at 10, 27, 33.

[137] Docket 51-3 at 40.

[138] Docket 51-3 at 25.

[139] Docket 51-3 at 25.

[140] Docket 51-3 at 25.

[141] Docket 51-3 at 25.

[142] Docket 51-3 at 25.

and, in 2022, he moved into a four-room house on campus with his brother and another friend.[143] He socialized with them, had a TV, internet, and laundry facilities, used the delivery service, and attended another machinist's birthday party.[144]

In 2020 and 2021, Ms. Patton worked 16 to 20-hour shifts.[145] In 2022, during the preseason, she worked 12-hour shifts, and she got eight hours of sleep a night.[146] During the time AGS was a closed campus, when Ms. Patton was off shift, she would sleep, call her children on the phone, and do laundry.[147] She was not allowed to go to the store, as she had done twice a season prior to 2020.[148]

Mr. Barlahan worked 12-hour shifts during the preseason, and, during processing season, he worked 17-hour shifts.[149] Prior to 2020, when off shift, Mr. Barlahan slept, did laundry, and walked to the store.[150] In 2020, when he was off shift, he slept.[151]

---

[143] Docket 51-3 at 29, 33.

[144] Docket 51-3 at 33-34.

[145] Docket 51-4 at 5.

[146] Docket 51-4 at 5.

[147] Docket 51-4 at 10.

[148] Docket 51-4 at 7, 10.

[149] Docket 51-5 at 7.

[150] Docket 51-5 at 7-8.

[151] Docket 51-5 at 11.

In 2020 in Egegik, Mr. Bauman worked 13-hour shifts.[152]  When asked what he did with his downtime, he said, "[In] 2020 we were restricted to campus, so there was no[t] really downtime."[153]  In 2021 in Naknek, when he was not working, Mr. Bauman "watched movies[,] . . . wrote a few letters, talked to [his] family."[154]  He also did laundry, consumed alcohol, and could have walked around AGS's Naknek compound, but stated that "it was frowned upon" due to the pandemic.[155]

In light of this record, Plaintiffs actually engaged in extensive personal activities during waiting time.[156]  They slept, ate, ordered pizza, did laundry, called friends and family, watched TV, played video games, and drank beer.  Some of them attended a midseason party and a birthday party.  They also socialized with friends on campus.  Accordingly, the third and seventh factors weigh strongly in favor of finding Plaintiffs were able to engage in personal activities during waiting time.

The fourth and fifth factors are less helpful in analyzing whether Plaintiffs could use their waiting time for personal activities.  Relevant to the fourth factor—

---

[152] Docket 51-7 at 6.

[153] Docket 51-7 at 6.

[154] Docket 51-7 at 7.

[155] Docket 51-7 at 7-8.

[156] *See Brigham*, 357 F.3d at 936-37 (noting that the seventh factor weighed in favor of finding employees could use on-call time to pursue personal activities when they actually used some of that time to "sleep, eat, read, study, exercise, watch television, help their children with homework, play games, maintain their homes and yards, work on their motorcycles, and entertain guests").

whether a fixed time limit for response was unduly restrictive—the Processor and Beach Gang CBAs provided that AGS would give employees two hours advance notice for any call to work.[157] Mr. Ross testified that he was called out to fix the power three to four times each season and that, when he was needed to fix the power, he either responded on his own because he could see that the power went down or someone came and alerted him.[158] Cody Flaherty testified that there was no set time to respond to a call but "[i]t was more like, . . . hey, we need you down here."[159] Kegan Flaherty testified that when "called back to work, someone would come grab you."[160] But he was never called back in 2020 or 2021, and, in 2022, he was once "asked if [he] would be willing to work, and [he] said yes[,] [b]ut it ended up that [he] did not have to go down."[161] Considering that Plaintiffs were residing on campus and were often alerted in person when needed, the time to respond to a call is less indicative of whether a fixed time limit for response was unduly restrictive such that it restricted Plaintiffs' ability to engage in personal activities.

The same is true of the fifth factor: whether the on-call employee could easily trade on-call responsibilities. Mr. Ross stated that his position was unique in that

---

[157] Docket 51-16 at 7; Docket 51-17 at 12.

[158] Docket 51-1 at 11-12.

[159] Docket 51-2 at 14.

[160] Docket 51-3 at 7.

[161] Docket 51-3 at 34.

he was responsible for helping with refrigeration and fixing power issues.[162]  Kegan Flaherty testified that "[t]here was no trading" shifts.[163]   However, according to Cody Flaherty, if an employee needed to, he or she could trade a shift to take a day off.[164]  Mr. Bauman stated that when there was a "callout" and "some work to be done after hours, . . . the beach [gang] boss would come along and ask for volunteers."[165]  The Beach Gang CBA provided that "[w]hen overtime is assigned, the company shall make every reasonable effort to make all hours equally available to all members of the beach gang wherever practical."[166]   The record indicates that, while shifts were not traded, if necessary, machinists could find someone to cover their shift, and beach gang members could trade on call responsibilities.   The fourth and fifth factors are therefore neutral as to whether Plaintiffs could pursue personal activities during waiting time.

Finally, the sixth factor—whether use of a pager could ease restrictions—is less relevant when employees lived on company grounds.   Cody Flaherty was called in over the phone or via a radio.[167]   Mr. Ross "[had] a cell phone and . . .

---

[162] Docket 51-1 at 39-40.

[163] Docket 51-3 at 38-39.

[164] Docket 51-2 at 36.

[165] Docket 51-7 at 9.

[166] Docket 51-17 at 12.

[167] Docket 51-2 at 14.

they could call [him] any time."[168]  This could be viewed as either making Mr. Ross's waiting time less restrictive, as he could spend off duty time outside his bunkhouses and somewhere on campus, or as highly restrictive because Mr. Ross could be contacted instantly.  And the two-hour advance notice provided to the beach gang and processers under their CBAs would make pagers of little utility, as such advance notice would theoretically allow those workers to complete any off-shift personal activities before returning to work.  Apart from Mr. Ross, the Court finds that this factor weighs in favor of finding that Plaintiffs could pursue personal activities while waiting.

In sum, the first and second *Owens* factors indicate that Plaintiffs could not use their waiting time for personal activities, the third and seventh factors strongly indicate that they could, the fourth and fifth factors are neutral, and the sixth factor indicates most Plaintiffs could use their waiting time for personal activities.

However, the *Owens* factors are only the first part of the Court's analysis of whether Plaintiffs were waiting to be engaged or were engaged to wait.  In addition to evaluating the degree to which Plaintiffs were free to engage in personal activities during waiting time, the Court must determine if there was an agreement between the parties regarding whether waiting time was compensable.[169]

"[A]n agreement cognizable for purposes of the FLSA overtime inquiry may

---

[168] Docket 51-1 at 28.

[169] *Brigham*, 357 F.3d at 936 (citation omitted).

arise by conduct."[170] "A constructive agreement may arise if employees have been informed of the overtime compensation policy and continue to work under the disclosed terms of the policy."[171] "[T]he existence of such agreements assists the trier of fact in determining whether the parties characterized the time spent waiting on-call as actual work."[172] Accordingly, "[a]n agreement between the parties which provides at least some type of compensation for on-call waiting time may suggest the parties characterize waiting time as work."[173] "Conversely, an agreement pursuant to which the employees are to be paid only for time spent actually working, and not merely waiting to work, may suggest the parties do not characterize waiting time as work."[174]

Here, Plaintiffs worked under CBAs that provided for an eight-hour workday, overtime compensation when Plaintiffs worked more than eight hours a day and 40 hours a week, and a minimum of two hours of overtime pay when Plaintiffs were called back to work after their shift ended.[175] Plaintiffs consistently worked shifts longer than eight hours, and they received overtime compensation pursuant to the

---

[170] *Id.* at 938.

[171] *Berry*, 30 F.3d at 1180 (citation omitted).

[172] *Id.* at 1181.

[173] *Id.*

[174] *Id.*

[175] Docket 51-15 at 8, 12; Docket 51-16 at 6-7; Docket 51-17 at 12; Docket 51-20 at 8, 10-11.

terms of the CBAs.[176]  When they were called back to work, they were also paid

pursuant to the CBAs.[177]  Therefore, the CBAs provided for payment for time spent

actually working.

In 2022, the machinists' union renegotiated their CBA.[178]  The renegotiated

CBA added a new section:

> 9.3    Penalty Time: Any employee who does not have a four
> (4) hour rest period between shifts will be given eight (8) hours
> of pay at the straight time rate automatically, plus, all hours
> worked the following day will be paid at an overtime rate of one
> and a half times (1.5x) their regular hourly rate.  Any work
> triggering Penalty Time must be specifically approved by the
> Plant Manager or other Company designated person.  The
> Plant Manager may adjust the following day's shift start time to
> allow for a four (4) hour rest period.[179]

Previously, the Machinist CBA provided that, after machinists "terminated a

shift, they shall not be required to start work again until a four (4) hour rest period

has elapsed, unless they receive overtime pay."[180]  The addition of the penalty time

provision indicates that the Machinist 2020 and 2021 CBAs did not recognize rest

time as compensable working time; the 2022 Machinist CBA only recognized rest

---

[176] *See* Docket 51-21 (C. Flaherty's time sheets indicating regular 11 to 18-hour shifts in 2020
and 2021); Docket 51-22 (K. Flaherty's time sheets indicating regular 11 to 19-hour shifts in
2020 and 2021); Docket 51-7 at 6 (Bauman testifying he "clock[ed] in at 8 a.m. and then [was]
off the clock at 9 p.m.").

[177] Docket 51-1 at 21-23, 25, 27-28 (Ross); Docket 51-2 at 47, 65 (C. Flaherty); Docket 51-3 at
39 (K. Flaherty); Docket 51-7 at 15-16 (Bauman).

[178] Docket 51-20.

[179] Docket 51-20 at 8.

[180] Docket 51-15 at 8.

time as compensable time when the rest period between shifts was less than four hours.

In addition, before 2020, Plaintiffs had never been compensated for waiting or sleep time, and they returned to work each season under those terms. Before 2020, Mr. Ross had never been paid by AGS for off-shift time except when he was called back to work.[181] Nor had he ever been paid by AGS for sleep time, and he returned to work at AGS in Naknek in 2021 and 2022 knowing sleep time was unpaid.[182] Cody Flaherty had never been paid for off-shift time except when he was called back to work.[183] He also had never been paid by AGS for sleep time, and he returned to work at AGS in 2020, 2021, and 2022 knowing that sleep time was unpaid.[184] Kegan Flaherty had never been paid for off-shift time or for sleep time, and he returned to work at AGS in 2020, 2021, and 2022 knowing that sleep time was unpaid.[185] Ms. Patton had never been paid for off-shift time,[186] and neither had Mr. Barlahan.[187] Mr. Bauman similarly had never been paid for any time that he was not working while on AGS property in Egegik, and he had never

---

[181] Docket 51-1 at 30-31.

[182] Docket 51-1 at 45.

[183] Docket 51-2 at 39.

[184] Docket 51-2 at 62.

[185] Docket 51-3 at 41, 52.

[186] Docket 51-4 at 9.

[187] Docket 51-5 at 10.

been paid for sleep time.[188]  Further, Plaintiffs were informed that AGS would be operating a closed campus before they traveled to Alaska in 2020,[189] 2021,[190] and 2022.[191]

Plaintiffs chose to work for AGS during the COVID-19 pandemic fully aware of the closed campus policy and that waiting time was uncompensated, signaling their constructive acceptance of those terms.[192]  Accordingly, the record shows that the CBAs only provided payment for actual working time, and there was a constructive agreement between the parties that waiting time, even on a closed campus, was uncompensated.

### ii.  Sleep Time

Plaintiffs, in the alternative, invoke 29 C.F.R. § 785.22 regarding 24-hour duty and sleep time to support their claim for overtime compensation.[193]  In its

---

[188] Docket 51-7 at 10.

[189] Docket 51-27 at 2-3 (email to C. Flaherty noting that "only approved '[r]unner' personnel will be allowed to leave camp this season" and "[a]ll other personnel must stay onsite at all times"), 18-19 (email to Barlahan noting same).

[190] Docket 51-1 at 16 (Ross); Docket 51-2 at 25 (C. Flaherty); Docket 51-3 at 28 (K. Flaherty); Docket 51-4 at 22-23 (Patton); Docket 51-27 at 24 (Bauman).

[191] Docket 51-1 at 22 (Ross); Docket 51-2 at 28 (C. Flaherty); Docket 51-3 at 30 (K. Flaherty); Docket 51-4 at 22-23 (Patton).

[192] *See Owens*, 971 F.2d at 355 ("[T]he Plaintiff mechanics . . . may not have liked the company's formal call-in system, but by continuing to work, they constructively accepted the new terms.").

[193] Docket 67 at 38-39, 41 (quoting 29 C.F.R. § 785.22(a), which provides, "Where an employee is required to be on duty for 24 hours or more, the employer and the employee may agree to exclude bona fide meal periods and a bona fide regularly scheduled sleeping period of not more than 8 hours from hours worked, provided adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep.  If sleeping period is of more than 8 hours, only 8 hours will be credited.  Where no expressed or implied

motion for summary judgment, AGS disputes the applicability of § 785.22.[194] Instead, AGS contends that 29 C.F.R. § 785.23 applies because it refers to employees residing on the employer's premises.[195]

AGS is correct that § 785.23 applies. In *Brigham*—where the employees resided on the utility company's remote property and worked 24-hour on-call shifts—the Ninth Circuit rejected the employees' argument that § 785.22 applied.[196] Rather, the Ninth Circuit held that "the more specific regulation should control over the more general, and thus . . . § 785.23 provides the most pertinent regulatory guidance."[197] Because Plaintiffs resided on AGS's property, § 785.23 applies here.

Section 785.23 provides that "[a]n employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises." Because of the difficulty

---

agreement to the contrary is present, the 8 hours of sleeping time and lunch periods constitute hours worked.").

[194] Docket 48-1 at 54-56.

[195] Docket 48-1 at 50-54 (quoting 29 C.F.R. § 785.23, which provides, "An employee who resides on his employer's premises on a permanent basis or for extended periods of time is not considered as working all the time he is on the premises. Ordinarily, he may engage in normal private pursuits and thus have enough time for eating, sleeping, entertaining, and other periods of complete freedom from all duties when he may leave the premises for purposes of his own. It is, of course, difficult to determine the exact hours worked under these circumstances and any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted.").

[196] *Brigham*, 357 F.3d at 933-34, 940 n.17.

[197] *Id.* at 940 n.17 (citation omitted).

"determin[ing] the exact hours worked under these circumstances[,] . . . any reasonable agreement of the parties which takes into consideration all of the pertinent facts will be accepted."[198] An employer that seeks to exclude certain waiting time from compensable hours worked when their employees live on their property must show, "plainly and unmistakably, that (1) there was an agreement to compensate [employees] for [their] overtime work . . . , and (2) the agreement was reasonable, having taken into account all of the pertinent facts."[199] "[T]he reasonableness of a § 785.23 agreement must be assessed in light of all of the surrounding circumstances" and it "must take into account some approximation of the hours actually worked, or reasonably required to be worked, by the employee."[200]

Here, as noted above, the CBAs did not consider sleeping time as work because the agreements only provided payment for time actually spent working. Regarding whether those agreements were reasonable, the CBAs accounted for all hours actually worked because they provided compensation for overtime work performed by Plaintiffs during shifts longer than eight hours and a minimum of two hours for all call time. And, during the unique circumstances of the COVID-19 pandemic, while Plaintiffs could not leave the premises, they could still engage in

---

[198] 29 C.F.R. § 785.23.

[199] *Leever v. City of Carson*, 360 F.3d 1014, 1018 (9th Cir. 2004) (internal quotation marks and citation omitted). *See* 29 C.F.R. § 785.23.

[200] *Leever*, 360 F.3d at 1021.

personal activities, including sleeping, as well as eating, watching TV, playing video games, speaking to family and friends on the phone, showering, and doing laundry. Further, as with waiting time, there was a constructive agreement between the parties that sleep time was uncompensated, as Plaintiffs arrived at AGS's facilities aware that they were closed campuses and that sleep time had previously been uncompensated, and Plaintiffs continued to work on the closed campus without compensation for sleep time.[201] As such, the agreements between the parties that waiting and sleep time were not compensable working hours were reasonable.

Accordingly, AGS has shown that there were agreements between the parties regarding compensation for overtime work, the agreements provided that waiting and sleep time were not compensable working time, and the agreements were reasonable because they allowed for an accurate computation of compensable overtime and accounted for the pertinent facts. The Court therefore grants AGS's motion for summary judgment as to Plaintiffs' FLSA claim.[202]

---

[201] *See Owens*, 971 F.2d at 355.

[202] The Court's grant of summary judgment also applies to Plaintiffs' claims regarding AGS's facilities in Ketchikan and Egegik. Mr. Ross was the only Plaintiff who worked at Ketchikan, and he testified that he was not subject to the closed campus policy and could leave campus as he pleased. Docket 51-1 at 21-22. Mr. Bauman was the only Plaintiff who worked at Egegik, and his testimony on the conditions at Egegik was sparse. Therefore, Plaintiffs have not offered "specific facts showing that there is a genuine issue for trial" to overcome the "absence of evidence to support [Plaintiffs'] case" regarding Egegik or Ketchikan. *Celotex Corp.*, 477 U.S. at 324; *Devereaux*, 263 F.3d at 1076 (citations omitted).

### c. Alaska Wage and Hour Act

"The AWHA requires an employer to pay employees at the overtime rate of one and one-half times the regular rate for hours worked in excess of eight hours a day or forty hours a week."[203] "The starting point for determining whether overtime pay is due is thus a determination of employee time spent 'actually working.'"[204] Alaska courts apply the Ninth Circuit's *Owens* framework to determine "whether employees' time is so restricted that they deserve to be compensated for it" under the AWHA.[205]

Because the Court's analysis under *Owens* concluded that Plaintiffs were not actually working during their waiting time, Plaintiffs are not entitled to overtime compensation for waiting time or sleep time under the AWHA. Accordingly, the Court grants AGS's motion for summary judgment as to Plaintiffs' AWHA claim.

## II. Remaining Motions

Remaining before the Court are AGS's Motion to Certify a Question to the Alaska Supreme Court and to Stay Proceedings at Docket 52, Plaintiffs' Motion for Certification of a Rule 23 Class Action at Docket 54, and Plaintiffs' Motion for Conditional Certification of a FLSA Collective Action at Docket 56. Because the Court grants summary judgment to AGS on Plaintiffs' FLSA and AWHA claims, the

---

[203] *Moody v. Lodge*, 433 P.3d 1173, 1179 (Alaska 2018) (internal quotation marks and emphasis omitted).

[204] *Id.*

[205] *Id.*

remaining motions are denied as moot.

## CONCLUSION

In light of the foregoing, IT IS ORDERED that:

- AGS's *Motion for Summary Judgment on Plaintiffs' "Closed Campus" Claims* at Docket 48 is GRANTED;

- AGS's *Motion to Certify a Question to the Alaska Supreme Court and to Stay Proceedings* at Docket 52 is DENIED as moot;

- Plaintiffs' *Motion for Certification of a Rule 23 Class Action* at Docket 54 is DENIED as moot; and

- Plaintiffs' *Motion for Conditional Certification of a FLSA Collective Action* at Docket 56 is DENIED as moot.

Accordingly, Plaintiffs' claims are DISMISSED with prejudice. The Clerk of Court shall enter a final judgment accordingly.

DATED this 15th day of November, 2023, at Anchorage, Alaska.

*/s/ Sharon L. Gleason*
UNITED STATES DISTRICT JUDGE